WILLIAM H. JENNINGS *vs.* WHITEHEAD AND ATHERTON MACHINE COMPANY.

Bristol.    Oct. 30, 1884. — Feb. 27, 1885.    C. ALLEN & COLBURN, JJ., absent.

If an oral agreement is entered into during a conversation between A. and C., which is identical in terms with a written contract previously executed by A. and B., the predecessor of C. in business, and the written contract is vague or obscure in its meaning, it is competent to show, from statements made by the parties to each other, what both parties understood it to mean, and also to show what it had been actually interpreted to mean by the original parties in their dealings under it, for the purpose of proving what the parties meant in making the oral contract, even if the evidence would have been incompetent had the new contract been in writing.

No exception lies to the admission of immaterial evidence on the cross-examination of a witness.

No exception lies to the admission of incompetent evidence, if the fact which it tends to prove is conceded.

In an action upon an agreement, by the terms of which the plaintiff agreed to give his undivided influence in favor of the machinery manufactured by the defendant, who agreed to pay the plaintiff a commission on all sales made and machinery furnished to parties in a certain city, it appeared that the plaintiff was a director in two mill corporations in that city, to which machinery had been sold by the defendant; that on the sales of this machinery to one of these mills he had received commissions, and on the sales to the other he claimed commissions in this action; and that he did not disclose to his associates that he was receiving commissions on these sales of machinery by the defendant. The judge instructed the jury, that they had "a right to consider the commercial morality of such conduct as affecting the plaintiff's veracity or truthfulness as a witness." *Held,* that the plaintiff had no ground of exception.

FIELD, J.    It appears that the plaintiff, as the party of the first part, and the firm of Whitehead and Atherton, as the party of the second part, executed a written contract in 1877, the

material part of which was as follows: "The party of the first part, for and in consideration of the sum of money hereinafter named to be paid by the party of the second part, doth hereby agree to give his undivided influence in favor of the machinery manufactured by the party of the second part, and the party of the second part doth hereby promise and agree to pay to the party of the first part the sum of five per cent on all sales made and machinery furnished to parties in Fall River from and after this date;" that the defendant corporation was organized in 1880, and acquired the property of that firm, its members or some of them becoming stockholders in the corporation; and that the corporation continued to manufacture the same kind of machinery as had been manufactured by Whitehead and Atherton.

The plaintiff declared upon a contract, and also upon an account annexed, but relied at the trial upon an oral contract between the plaintiff and the defendant, "adopting the written agreement between himself and the firm of Whitehead and Atherton." This means that the oral contract relied on was identical in terms with the written contract, except that the defendant was substituted for the firm of Whitehead and Atherton as the party of the second part. The evidence of the adoption of this written contract was a conversation between the plaintiff and William E. Whitehead, who had been a member of the firm of Whitehead and Atherton, and then was president of the corporation, and "the subsequent acts of the defendant corporation in dealing with the plaintiff as to sales of some machinery." It was open to the defendant to show, not only that it never made such an oral contract with the plaintiff, but also to show that it made a different contract with him under which the subsequent dealings put in evidence were had. Indeed, under the second count of the declaration, if a different parol contract was shown, and the plaintiff had performed it, he could recover whatever money was due him under it and included in the account annexed; but the plaintiff at the trial made no such claim. As the contract relied on was oral, the rule that evidence of previous or contemporaneous conversations between the parties cannot be received to vary or control a written contract is not directly pertinent. The case stands as if there had been testimony of the exact words of the oral contract, and also evidence

of the subsequent acts of the parties from which the existence of such a contract was to be inferred.

Atherton, the treasurer of the corporation, was permitted to testify, against the plaintiff's objection and exception, to a conversation with the plaintiff, had some days before the written contract with Whitehead and Atherton was signed, of which firm he was then a member, to the effect that the plaintiff stated that he would do certain things if they would let him sell their machinery, in consequence of which the contract was written and signed. This evidence was offered " for the purpose of explaining what was intended by the words 'undivided influence'" in the written contract, which words the court had previously ruled " had no specific technical meaning."

We think the evidence was, under the circumstances, competent. It does not appear what the conversation was between the plaintiff and Whitehead, which the plaintiff contended was an adoption by the corporation of the written contract. Whatever reference was made in that conversation to the written contract, it could not incorporate that contract as a written contract into the oral agreement of the parties. The agreement entered into in that conversation was wholly oral, and if the written contract was vague or obscure in its meaning, we think it was competent to show, from statements made by the parties to each other, what both parties understood it to mean, and also to show what it had been actually interpreted to mean by the original parties in their dealings under it, for the purpose of proving what the same persons meant in making an oral contract similar or the same in terms, even if the evidence would have been incompetent had the new contract been in writing.

The question is, What contract did the parties understand, or as reasonable men ought to have understood, they made in the conversation they had, considered in reference to the subject matter of the conversation and the circumstances under which it took place? If, in that conversation, it had been expressly agreed that the written contract should be interpreted or understood in a particular way, and should be adopted in that sense, there is no doubt that this could be shown as a part of the conversation and of the contract orally made, even although this interpretation were different from that which a court would give

to the written contract. If, however, it was not expressly agreed in the conversation that the written contract should be interpreted in a particular way, but it appeared from statements the parties had made to each other, either before or after executing it, or by the actual construction given to it in their dealings, that the parties understood it in a particular way, we think that understanding could be shown for the purpose of determining what the oral agreement was. Such statements may be considered as a part of the negotiations with reference to which the oral contract was made. The testimony of Atherton had some tendency to show what the plaintiff understood the written contract to mean, and we do not know that Whitehead, when he had the conversation with the plaintiff, or the corporation, when it subsequently dealt with the plaintiff, did not have the same understanding of it.

The testimony of the plaintiff's witnesses, on cross-examination, that the purchases of machinery were made through Atherton or Whitehead, was either competent, as tending to show that these purchases were not within the contract which the defendant contended it made with the plaintiff, or was immaterial; and to the admission of immaterial testimony on cross-examination no exception lies. Indeed, the plaintiff " did not claim that he had anything in person to do with the sales to the mills named in the declaration; " and, if the testimony was incompetent, it was offered to prove a conceded fact. *Sibley* v. *Leffingwell*, 8 Allen, 584. *Bragg* v. *Boston & Worcester Railroad*, 9 Allen, 54.

It appeared that the plaintiff was a director in two mill corporations in Fall River, to which machinery had been sold by the defendant; that on the sales of this machinery to one of these mills he had received commissions, and on the sales to the other he claimed commissions in this action; and that he did not disclose to his associates that he was receiving commissions on these sales of machinery by the defendant. The presiding justice instructed the jury that they had " a right to consider the commercial morality of such conduct as affecting the plaintiff's veracity, or truthfulness as a witness; " and to this the plaintiff excepted. It does not appear by whom this testimony was introduced, but it was in the case without objection; and

the plaintiff's exception is not put on the ground that the evidence was improperly in the case. We must assume that it was competent for some purpose. Such testimony could not properly have been introduced by the defendant for the purpose of affecting the credit of the plaintiff as a witness. *Holbrook* v. *Dow*, 12 Gray, 357. The facts properly before the jury, which they may consider as affecting the degree of credit they should give to a witness, are not always facts of the existence of which independent evidence could be introduced for that purpose.

Jurors are instructed that they may consider the appearance of a witness who testifies before them, in determining the degree of credit to be given him, although, if the evidence of the witness has been taken by deposition, evidence of his appearance in giving his deposition has never been admitted. Independent evidence that a witness is of a low order of intelligence or of moral character cannot be introduced to affect his credit; but, if he appears to be so on the stand, the jury undoubtedly have a right to consider it as affecting his credit. It has been usual to permit counsel in argument to comment upon the conduct of the parties, so far as it is shown by evidence in the cause. One ground on which independent evidence of particular acts of misconduct has been excluded as evidence affecting the credit of a witness is, that it opens collateral issues which the witness may not be prepared to meet, tends to distract the minds of the jury from the principal issue to be tried, and unduly prolongs the trial.

But we are not aware that it has ever been decided that facts properly in evidence, affecting the conduct or character of a party who is also a witness, may not properly be considered by a jury, in determining the degree of credit to be given to his testimony, if in their judgment they have any tendency to show that he does not accurately remember or truly state the facts to which he testifies. Whether there may not be immoral or dishonorable conduct which yet has no natural tendency whatever to show a disposition not to tell exactly the whole truth, need not be decided; perhaps the jury can as well judge of that as the court. The court is governed by legal rules; and if, by those rules, evidence affecting the character of a party and witness is properly admitted as competent evidence in the cause,

we cannot say that the jury have not a right to consider it as affecting his veracity, if they think it has any tendency to throw light upon it.                                        *Exceptions overruled.*

*A. J. Jennings,* (*J. M. Morton* with him,) for the plaintiff.

*M. Reed,* for the defendant.